UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

NICHOLAS PYZEL, et al.,                    :
                                           :
                        Plaintiffs,        :
                                           :
            v.                             :    Case No. 1:25-cv-06398-ER
                                           :
DISCOVERY COMMUNICATIONS, LLC,             :
                                           :
                        Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
<u>MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO SEVER CLAIMS</u>**

Michael W. McTigue Jr.
(michael.mctigue@skadden.com)
Meredith C. Slawe
(meredith.slawe@skadden.com)
Kurt Wm. Hemr
(kurt.hemr@skadden.com)
Andrew D. Quinn
(andrew.quinn@skadden.com)
SKADDEN ARPS SLATE
    MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001-8602
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Defendant
Discovery Communications, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ....................................................................................... 1

FACTS AND ALLEGATIONS OF RECORD ................................................................ 4

    A.     Discovery, the Discovery+ Streaming Service, and the Visitor Agreement .......... 4

    B.     Keller Postman's "Mass Arbitration" Litigation Strategy ...................................... 5

    C.     Keller Postman's Unsuccessful Mass Arbitration Threat Against
    Discovery ................................................................................................................. 7

          1.     Keller Postman Deploys an Expedited Claimant Sign-Up Process
              and Promises Potential Claimants They Will "Owe Nothing" .................. 7

          2.     Keller Postman Submits Thousands of Identical Demand Letters
              Signed by a Keller Postman Attorney and Threatens Thousands
              More Claims ............................................................................................. 8

          3.     Keller Postman Submits a Mass Filing With JAMS and JAMS
              Declines to Administer the Arbitrations; Neither Plaintiffs Nor
              Their Counsel Pay Any Fees .................................................................... 8

          4.     In an Effort To Force Arbitration Before JAMS, Keller Postman
              Files the *Pilon* Action on Behalf of Two Petitioners ................................. 9

          5.     Keller Postman Demands That Discovery Tell Keller Postman
              Which of Its Putative Clients Are Bound by the JAMS Agreement
              So That Keller Postman Could Make a Mass Filing With JAMS ............. 10

    D.     Keller Postman Files This Action, Seeking to Force Discovery to Perform
    Keller Postman's Client Representation Obligations for Them .......................... 11

    E.     Keller Postman Acknowledges at the Pre-Motion Conference That They
    Did Not Contact Their Clients to Gather Additional Information Before
    Bringing This Action ........................................................................................... 12

LEGAL STANDARD ................................................................................................... 12

ARGUMENT ............................................................................................................... 13

I.      SUBJECT MATTER JURISDICTION IS LACKING HERE: PLAINTIFFS DO NOT HAVE ARTICLE III STANDING BECAUSE THEIR ASSERTED HARMS ARE COUNTERFACTUAL, SPECULATIVE, AND NOT REDRESSABLE BY THE REQUESTED RELIEF ........................................................ 13

II.     PLAINTIFFS HAVE NOT PLED A LEGALLY SUFFICIENT CLAIM FOR RELIEF BECAUSE THERE IS NO LEGAL PREDICATE FOR THEIR REQUESTED DECLARATORY RELIEF .................................................................... 17

III.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DISMISS THE COMPLAINT BECAUSE THIS ACTION WAS BROUGHT FOR IMPROPER PURPOSES ....................................................................................................... 19

IV.    THE COURT SHOULD NOT GRANT PLAINTIFFS LEAVE TO AMEND ................ 23

V.     IN THE ALTERNATIVE, THE COURT SHOULD SEVER AND DISMISS PLAINTIFFS' CLAIMS BECAUSE THEY ARE IMPROPERLY JOINED .................. 24

CONCLUSION ........................................................................................................... 25

CERTIFICATE OF COMPLIANCE ........................................................................... 27

# TABLE OF AUTHORITIES

**CASES**                                                                                                      **Page(s)**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................13

*Barchha v. TapImmune, Inc.*,
   No. 12 Civ. 8530 (PKC), 2013 WL 120639 (S.D.N.Y. Jan. 7, 2013)..............................18

*Bartels v. Sports Arena Employees Local 137*
   838 F.2d 101 (3d Cir. 1988)...........................................................................15

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................13

*Buckley v. Bassett*,
   No. 22-cv-01436 (JMA) (ARL), 2024 WL 896880 (E.D.N.Y. Mar. 1, 2024) ................17

*Chevron Corp. v. Naranjo*,
   667 F.3d 232 (2d Cir. 2012)...........................................................................17, 18

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ........................................................................................16

*Collins & Aikman Corp. v. Rabin*,
   No. 86 Civ. 1223 (WCC), 1986 WL 6162 (S.D.N.Y. May 27, 1986)..............................20

*Corley v. Google, Inc.*,
   316 F.R.D. 277 (N.D. Cal. 2016) ....................................................................25

*De Medicis v. Ally Bank*,
   No. 21 Civ. 6799 (NSR), 2024 WL 1257022 (S.D.N.Y. Mar. 25, 2024)........................13

*Dinosaur Financial Group LLC v. S&P Global, Inc.*,
   No. 22 Civ. 1860 (KPF), 2023 WL 4562031 (S.D.N.Y. July 14, 2023) .........................13

*Dow Jones & Co. v. Harrods, Ltd.*,
   237 F. Supp. 2d 394 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003).... 14, 16, 20, 21

*Dow Jones & Co. v. Harrods, Ltd.*,
   346 F.3d 357 (2d Cir. 2003)..........................................................................14, 20

*Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   725 F.2d 192 (2d Cir. 1984)............................................................................19

*Epstein v. JPMorgan Chase & Co.*,
   No. 13 Civ. 4744 KPF, 2014 WL 1133567 (S.D.N.Y. Mar. 21, 2014)............................15

*Estate of Bishop v. Bechtel Power Corp.*,
    905 F.2d 1272 (9th Cir.1990)..................................................................15

*Flanagan v. Benicia Unified School District*,
    404 F. App'x 187 (9th Cir. 2010)............................................................15

*Frazier v. X Corp.*,
    155 F.4th 87 (2d Cir. 2025)......................................................................19

*Hahn v. JetBlue Airways Corp.*,
    No. 21-CV-6867 (CBA) (LB), 2022 WL 22908406 (E.D.N.Y. Aug. 25, 2022) .............24

*Harris Trust & Savings Bank v. E-II Holdings, Inc.*,
    926 F.2d 636 (7th Cir. 1991)....................................................................18

*Healthcare Finance Group, Inc. v. Bank Leumi USA*,
    669 F. Supp. 2d 344 (S.D.N.Y. 2009) .....................................................23

*Hughes v. National Football League*,
    No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025).....................1, 8, 21

*In re Joint Eastern & Southern District Asbestos Litigation*,
    14 F.3d 726 (2d Cir. 1993)........................................................................18

*In re SKAT Tax Refund Scheme Litigation*,
    Nos. 18-md-2865 (LAK), 18-CV-5053 (LAK),
    2020 WL 400718 (S.D.N.Y. Jan. 23, 2020) ...........................14, 16, 18, 20, 23

*Jacobs v. USA Track & Field*,
    374 F.3d 85 (2d Cir. 2004)........................................................................19

*Jones v. Ford Motor Co.*,
    No. 24-10721, 2024 WL 4719702 (E.D. Mich. Nov. 8, 2024) ........................25

*Jones v. Starz Entertainment, LLC*,
    129 F.4th 1176 (9th Cir. 2025)..................................................................21

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)......................................................................12

*Marshak v. Tonetti*,
    813 F.2d 13 (1st Cir. 1987).......................................................................15

*McQuoid v. Nationstar Mortgage, LLC*,
    No. 13-cv-2338 (DRH), 2015 WL 13774445 (E.D.N.Y. Apr. 2, 2015)...........24

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ................................................................................13

*Nolan v. International Business Machines Corp.*,
  No. 24-CV-04653 (PMH), 2025 WL 1078392 (S.D.N.Y. Apr. 10, 2025) ......................24

*Parvati Corp. v. City of Oak Forest*,
  630 F.3d 512 (7th Cir. 2010) .........................................................................................17

*Pilon v. Discovery Communications, LLC*,
  769 F. Supp. 3d 273 (S.D.N.Y. 2025) ........................................................ 2, 4, 5, 10, 22

*Port Washington Teachers' Ass'n v. Board of Education of Port Washington Union Free
  School District*,
  478 F.3d 494 (2d Cir. 2007) ...........................................................................................16

*Simon v. Eastern Kentucky Welfare Rights Organization*,
  426 U.S. 26 (1976) .........................................................................................................16

*Simon v. Scripps Networks, LLC.*,
  No. 24-CV-8175 (PKC), 2025 WL 3167915 (S.D.N.Y. Nov. 13, 2025) ..........................8

*Solomon v. Flipps Media, Inc.*,
  136 F.4th 41 (2d Cir. 2025), *petition for cert. filed*,
  No. 25-228 (U.S. Aug. 27, 2025) .......................................................................... 1, 8, 21

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .......................................................................................................14

*U1it4Less, Inc. v. FedEx Corp.*,
  No. 11-cv-1713 (KBF), 2015 WL 3916247 (S.D.N.Y. June 25, 2015) ..........................24

*Unique Industries, Inc. v. Lisa Frank, Inc.*,
  No. 93 CIV. 8037 (LAP), 1994 WL 525041 (S.D.N.Y. Sept. 23, 1994) .........................20

*VariBlend Dual Dispensing Systems LLC v. Crystal International (Group) Inc.*,
  No. 18 Civ. 10758 (ER), 2019 WL 4805771 (S.D.N.Y. Sept. 30, 2019) ........................16

*W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008) ...........................................................................................15

## **STATUTES**                                                             **Page(s)**

Federal Arbitration Act, § 4,
  9 U.S.C. § 4 ................................................................................................................ 4, 18

Video Privacy Protection Act of 1988,
  18 U.S.C. § 2710 ..............................................................................................................1

Declaratory Judgment Act,
  28 U.S.C. § 2201(a) ........................................................................................................17

v

**RULES**                                                                 **Page(s)**

Federal Rule of Civil Procedure 12(b)(1)..................................................................12

Federal Rule of Civil Procedure 12(b)(6)..................................................................13

Federal Rule of Civil Procedure 21............................................................................24


**OTHER AUTHORITIES**                                                     **Page(s)**

J. Maria Glover, *Mass Arbitration*,
    74 Stan. L. Rev. 1283 (2022) ...........................................................................6

Janet Nguyen, "That 18-inning World Series game was also a win for advertisers and
    Fox," Marketplace.org (Oct. 28, 2025),
    https://www.marketplace.org/story/2025/10/28/that-18inning-world-series-game-
    was-also-a-win-for-advertisers-and-fox .........................................................5

Joint Stipulation and Order on the Confirmation of Arbitration Award; Judgment,
    *Roku, Inc. v. Womble*, No. 25-cv-458510 (Cal. Super. Ct. Santa Clara Cnty.
    June 24, 2025) ...............................................................................................22

Petition to Confirm Arbitration Award, Attachment, *Roku, Inc. v. Womble*,
    No. 25-cv-458510 (Cal. Super. Ct. Santa Clara Cnty. Feb. 7, 2025) ..............22

*Pilon v. Discovery Commc'ns, LLC*, No. 1:24-cv-04760-JPO (S.D.N.Y. filed June 21,
    2024), ECF No. 1 ....................................................................................2, 10

Andrew J. Pincus *et al.*, U.S. Chamber of Com. Inst. for Legal Reform,
    *Mass Arbitration Shakedown: Coercing Unjustified Settlement*s (Feb. 2023)..............5, 6

"From Keller Lenkner to Keller Postman: Doubling Down on Mass Practice," Lawdragon
    (Apr. 15, 2022), https://www.lawdragon.com/lawyer-limelights/2022-04-25-from-
    keller-lenkner-to-keller-postman-doubling-down-on-mass-practice ...............6

## PRELIMINARY STATEMENT

For years, Plaintiffs' counsel Keller Postman LLC has threatened to initiate thousands of individual arbitrations against Discovery, alleging that Discovery violated the Video Privacy Protection Act of 1988, 18 U.S.C. § 2710 (the "VPPA"). The claims are all premised on Discovery's alleged use of third-party software "pixels" on its website, which, according to Keller Postman, could result in the disclosure of discovery+ streaming service subscribers' video-watching history. Precedents of the U.S. Court of Appeals for the Second Circuit confirm that such claims are meritless. *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 52-55 (2d Cir. 2025), *petition for cert. filed*, No. 25-228 (U.S. Aug. 27, 2025); *Hughes v. Nat'l Football League*, No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025). But Keller Postman's aim has never been to arbitrate these claims on the merits. Rather, Keller Postman's goal is to threaten Discovery with the prospect of millions of dollars in arbitration fees and to extract a lucrative settlement on that basis alone.

Keller Postman's plan relies on a superseded version of Discovery's consumer arbitration agreement that specified JAMS as the arbitration provider (the "JAMS Agreement"). In February 2023, Discovery updated the arbitration agreement and replaced JAMS with a different arbitration provider, National Arbitration and Mediation ("NAM"). That updated agreement (the "NAM Agreement") made Keller Postman's scheme unworkable, both because NAM's fee structure is not conducive to Keller Postman's mass arbitration ploy and because the NAM Agreement authorizes arbitrators to impose sanctions on counsel that bring frivolous actions. Nevertheless, Keller Postman continues to seek to proceed before JAMS, albeit without success:

• In **May 2024**, Keller Postman filed hundreds of arbitration demands with JAMS. JAMS declined to administer those arbitrations because Discovery's operative arbitration agreement—the NAM Agreement—named a different arbitration provider (*i.e.*, NAM).

• In **June 2024**, Keller Postman filed a petition in this District on behalf of two claimants—

not parties here—to compel Discovery to arbitrate before JAMS, arguing that the NAM Agreement was invalid and inapplicable to any discovery+ subscriber. *Pilon v. Discovery Commc'ns, LLC*, No. 1:24-cv-04760-JPO (S.D.N.Y. filed June 21, 2024), ECF No. 1.

• In **March 2025**, Judge Oetken resolved the *Pilon* petition, holding that one of the two petitioners was required to arbitrate before NAM because he continued to subscribe to discovery+ after the NAM Agreement was introduced, while the other, who terminated his subscription before February 2023, was entitled to arbitrate before JAMS. *Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273 (S.D.N.Y. 2025). That result—the correctness of which Keller Postman does not dispute (McTigue Decl. Ex.[1] 1, Conf. Tr. at 16:11-13)—did not help Keller Postman, because it made clear that Keller Postman could not simply file a JAMS arbitration on behalf of any individual who ever subscribed to discovery+. To date, Keller Postman has not initiated an arbitration on behalf of either *Pilon* petitioner.

• In **April 2025**, instead of simply asking its clients whether they subscribed to discovery+ after February 2023, Keller Postman demanded that Discovery examine its records and inform Keller Postman if some of its claimants could proceed before JAMS. Discovery naturally declined to facilitate Keller Postman's campaign of harassment.

• Just days later—on **May 1, 2025**—the Second Circuit's decision in *Solomon* established beyond doubt that the VPPA claims Keller Postman was putatively seeking to pursue had no merit. Discovery therefore suggested that Keller Postman cease its efforts to prosecute those claims.

Instead, Keller Postman brought this action on behalf of 4,225 individual Plaintiffs, seeking to enlist this Court in its effort to identify JAMS-eligible claimants. The Complaint requests a declaration "that each Plaintiff is entitled to arbitrate disputes with Discovery at JAMS or,

---

[1]    "McTigue Decl. Ex." refers to Exhibits to the Declaration of Michael W. McTigue Jr., filed herewith.

alternatively a declaration specifying which forum, JAMS or NAM, each Plaintiff must file a demand in." (Compl., ECF No. 1, at 58.) That is self-evidently absurd: as this Court rightly pointed out, "Plaintiffs' lawyers are required to do some diligence before bringing claims" (McTigue Decl. Ex. 1, Conf. Tr. at 11:23-25), and Keller Postman concedes that it has not undertaken to make inquiries of its clients. (*Id.* at 13:15-17 ("we haven't asked the individual plaintiffs in this case whether their subscriptions persisted beyond February 2023").) Keller Postman does not know whether its clients continued to subscribe to discovery+ after February 2023, whether its clients are still interested in pursuing claims against Discovery, or even whether its clients are still alive: at least two of the Plaintiffs in this action are dead.

Accordingly, this action should be dismissed for at least the following reasons:

*First*, Plaintiffs do not have standing. Plaintiffs assert they will suffer two harms if they do not obtain their requested declaration and file claims before JAMS anyway: (i) payment of a $250 filing fee, which they may lose if they were required to file before NAM, and (ii) procedural delay. (*See* Compl. ¶ 36.) But Plaintiffs will not have to pay any fees because Keller Postman promised Plaintiffs would "owe nothing" unless Keller Postman obtained a recovery on their behalf. Plaintiffs do not have standing to seek redress for a purported harm that will not affect them. In any event, Plaintiffs' purported harm is purely speculative, as it is contingent upon a chain of actions by a nonparty (JAMS) over whom Discovery has no control. As for any delay, that putative harm is entirely self-inflicted: Plaintiffs could proceed immediately before NAM. (*See* Part I *infra.*)

*Second*, Plaintiffs do not plead any sufficient legal predicate for their requested relief. The Declaratory Judgment Act ("DJA") is procedural, not substantive: it does not confer rights where the law does not otherwise provide such rights. Keller Postman asserts that Section 4 of the Federal Arbitration Act ("FAA") "provides a legal right" for the requested relief. (ECF No. 26 at 3.) Not

so. That section requires that a plaintiff to show he or she is "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate." 9 U.S.C. § 4. But Plaintiffs do not, and cannot, point to any action that constitutes a failure to arbitrate by Discovery. Discovery stands ready to arbitrate before NAM, and if Discovery interposes an objection before JAMS to JAMS's jurisdiction, that would not constitute a refusal to arbitrate. (*See* Part II *infra.*)

*Third*, the Court should exercise its broad discretion under the DJA to decline to grant the relief Plaintiffs seek. This Action is the epitome of procedural gamesmanship and is purely designed to spare Keller Postman the cost of fulfilling their professional obligations to investigate each of their individual clients' claims before burdening the courts, arbitration administrators, and Discovery with frivolous legal proceedings. Further, the relief requested here would not entitle Plaintiffs to arbitrate before JAMS: Discovery could still object to JAMS's jurisdiction before an arbitrator even if JAMS accepted a mass filing. (*See* Part IIII *infra.*)

*Fourth*, in the alternative, the court should sever and dismiss without prejudice Plaintiffs' individual claims because (i) both the JAMS and NAM Agreements prohibit consolidated actions such as this Action and (ii) joinder is improper because it would be impractical for this Court to conduct the 4,225 individualized inquiries requested in this action. (*See* Part V *infra.*)

Accordingly, this Court should grant Discovery's motion and dismiss the Complaint.

## FACTS AND ALLEGATIONS OF RECORD

### A.    Discovery, the Discovery+ Streaming Service, and the Visitor Agreement

Discovery operates discovery+, a subscription-based video streaming service. Subscribers may cancel their subscription at any time. *See Pilon*, 769 F. Supp. 3d at 282. Accordingly, subscribers choose each month between continuing and canceling their subscription. *See id.*

The discovery+ subscription agreement, called the "Visitor Agreement," includes an arbitration clause with a class action waiver. *Id*. Prior to January 9, 2023, the Visitor Agreement

4

provided that arbitrations would be conducted before JAMS. (JAMS Agreement, Compl. Ex. F, ECF No. 8-9, PDF pp. 10-12.) On January 9, 2023, Discovery updated the JAMS Agreement with an agreement that (i) superseded the JAMS Agreement, (ii) replaced JAMS as the arbitral forum with NAM, (iii) contained procedures for arbitrating mass arbitration claims in stages, and (iv) allowed arbitrators to impose sanctions on lawyers that filed claims for improper purposes. (NAM Agreement, Compl. Ex. G, ECF No. 8-10, PDF pp. 16-17.) On February 1, 2023, Discovery gave notice of the NAM Agreement, including through (i) an email to subscribers with a hyperlink to the agreement and (ii) a pop-up on the app and website. *Pilon*, 769 F. Supp. 3d at 283-84.

Both the JAMS Agreement and NAM Agreement provide that New York law governs any disputes. (ECF No. 8-9, PDF p. 21; ECF No. 8-10, PDF p. 23.) Both agreements also provide that a subscriber cannot consolidate his claims with the claims of others, and that an arbitrator or court also cannot consolidate claims. (ECF No. 8-9, PDF p. 22; ECF No. 8-10, PDF p. 23.)

**B.    Keller Postman's "Mass Arbitration" Litigation Strategy**

Keller Postman is a well-funded firm that boasts having "successfully represented over one million clients."[2] It is a leading firm behind the "mass arbitration" tactic. As the U.S. Chamber of Commerce explained in describing the tactic: "By simultaneously filing thousands of arbitration demands with identical claims, plaintiffs' lawyers seek to trigger an immediate obligation to pay millions of dollars in fees." Andrew J. Pincus *et al.*, U.S. Chamber of Com. Inst. for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlement*s at 18 (Feb. 2023).[3] "Their goal

---

[2]    *See* https://www.kellerpostman.com/our-team/ (last visited December 3, 2025). Keller Postman advertised its capacity during the recent World Series at considerable expense. *See* Janet Nguyen, "That 18-inning World Series game was also a win for advertisers and Fox," Marketplace.org (Oct. 28, 2025), https://www.marketplace.org/story/2025/10/28/that-18inning-world-series-game-was-also-a-win-for-advertisers-and-fox ("a 30-second commercial typically costs between $350,000 and $600,000").

[3]    Available online at https://instituteforlegalreform.com/wp-content/uploads/2023/02/Mass-Arbitration-Shakedown-digital.pdf.

appears not to be to obtain simultaneous decisions on the merits," but rather, "the goal appears to be to use the threat of a huge fee payment to force companies to settle the claims *en masse*, regardless of the underlying merits." *Id.* at 18. The mechanics of a mass arbitration are as follows:

> (i)    A firm runs advertisements, often on social media, touting that "qualified" individuals "may be entitled to up to $2,500 in compensation" if they "sign up" to bring a claim against a business. *See* McTigue Decl. Ex. 2 (Keller Postman's Facebook ad); J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1336 (2022) (citing interview with Keller Postman's managing partner and the lead attorney in this case, Warren Postman, as stating that Keller Postman spent "millions of dollars" to create "their own technology systems to handle mass claiming").

> (ii)   Individuals that click on the advertisements are taken to a sign-up page, where they are asked a few basic questions and/or prompted to provide basic documentation, such as screenshots, to determine if they are "qualified." (*See* McTigue Decl. Ex. 3 (Keller Postman Sign Up Page).)

> (iii)  The firm processes the responses, often through the use of automated means,[4] ostensibly to identify individuals that appear to be "qualified" to assert some kind of claim against the target business.

> (iv)   The firm contacts the business and threatens to file anywhere from hundreds to hundreds of thousands of individual claims in arbitration, a filing which would result in invoicing the business for millions of dollars in arbitration fees, unless the business agrees to a settlement.

> (v)    Absent a resolution, the firm will file those demands for arbitration to coerce settlement.

*Mass Arbitration Shakedown*, at 18. Accordingly, once the firm leading the mass arbitration campaign has invested resources in gathering a claimant pool, it has a strong economic incentive to avoid incurring costs associated with ongoing interactions with those clients. Glover, *Mass Arbitration*, 74 Stan. L. Rev. at 1336 & n.282 (2022) (citing interview with Attorney Postman; noting that such interactions "come at additional, significant cost").

---

[4]    "From Keller Lenkner to Keller Postman: Doubling Down on Mass Practice," Lawdragon (Apr. 15, 2022), https://www.lawdragon.com/lawyer-limelights/2022-04-25-from-keller-lenkner-to-keller-postman-doubling-down-on-mass-practice (quoting former Keller Postman partner discussing Keller Postman's "institutionalized approach to intake and processing").

C.      **Keller Postman's Unsuccessful Mass Arbitration Threat Against Discovery**

      1.      **Keller Postman Deploys an Expedited Claimant Sign-Up Process
and Promises Potential Claimants They Will "Owe Nothing"**

Here, Keller Postman solicited claimants through a process that, by design, permitted Keller Postman to perform little if any vetting of claimants. Beginning no later than November 2022, Keller Postman, through its partner law firm Troxel Law LLP, published advertisements on social media and sent direct email to individuals. Those solicitations targeted "users" not only of discovery+, but also HBO Max, Paramount, Starz, Showtime, and AMC. (McTigue Decl. Exs. 2, 3, 4.) The online solicitations touted that "users can sign up for a claim to get compensation in 2-3 minutes," and "could be entitled to $2,500 for privacy violation." (McTigue Decl. Ex. 2.) The advertisements said nothing about the claims other than to describe them as "Streaming Service Compensation Claims." (*Id.*) The solicitation emails mirrored the advertisements and similarly touted that "it takes about 1 to 2 minutes to answer a couple questions." (McTigue Decl. Ex. 4.)

The advertisements and emails led consumers to a website entitled "Streaming Privacy Violation Claims" that asked them to provide their name, email, and phone numbers, stating that "clicking the button will take you to a short qualification questionnaire." (McTigue Decl. Ex. 3, at PDF p. 1.) Keller Postman then represented on this website, in bold, prominent typeface, that "**It is free to sign up and you owe nothing unless we get you compensation**." (*Id.* at PDF p. 2.)

The Complaint indicates that Keller Postman obtained the "Account Screenshots" (Compl. Ex. D, ECF No. 4-1 *et seq.*) and "Declarations" (Compl. Ex. B, ECF No. 1-2 *et seq.*) during this cursory "sign-up" process, which most Plaintiffs completed in 2022. (*See* Compl. ¶ 14 ( "Plaintiffs retained" Keller Postman "to represent them in claims against Discovery" and "[i]n support of those claims, each Plaintiff procured a screenshot showing his or her Discovery+ account" and "also attested to several facts" in the Declarations).)

2.     **Keller Postman Submits Thousands of Identical Demand Letters Signed**
       **by a Keller Postman Attorney and Threatens Thousands More Claims**

In January and February 2023, Discovery received thousands of identical "Pre-Arbitration Notice[s] of Dispute" signed by a Keller Postman attorney and sent on behalf of Keller Postman's purported clients. (*See* Compl. ¶ 15; McTigue Decl. Ex. 5 (Exemplar Pre-Arbitration Notice of Dispute Letter).) The letters uniformly alleged that Keller Postman's purported clients were discovery+ users and that Discovery violated the VPPA because "Discovery may have shared the videos they watched and their identity with Meta Platforms, Inc." using "software called the Meta Pixel." (McTigue Decl. Ex. 5, at 1.) The letters did not contain any statements attesting to the dates of the claimants' purported discovery+ subscriptions.

The VPPA claims alleged in the letters are meritless. Most discovery+ subscribers were never affected by the Meta Pixel, which was implicated only if the subscriber accessed the service through a web browser (rather than on a smart TV or via an app, as is more typical). In any event, the Second Circuit has made clear that these claims are simply not viable under the VPPA. *See Solomon*, 136 F.4th at 52, 54-55; *Hughes*, 2025 WL 1720295, at *2.[5] Before Plaintiffs filed this Action, Discovery informed Keller Postman that their clients' claims are meritless under *Solomon* and *Hughes*. (*See* Compl. Ex. I, ECF No. 8-12, at PDF pp. 5-6 (bringing *Solomon* to Keller Postman's attention); McTigue Decl. Ex. 6 (June 30, 2025 letter to Keller Postman re: *Hughes*).)

3.     **Keller Postman Submits a Mass Filing With JAMS**
       **and JAMS Declines to Administer the Arbitrations;**
       **Neither Plaintiffs Nor Their Counsel Pay Any Fees**

On May 2, 2024, Keller Postman submitted 693 substantively identical arbitration demands against Discovery with JAMS, including demands on behalf of certain Plaintiffs (the

---

[5]    Just last month, Judge Castel dismissed a putative class action bringing similarly untenable VPPA claims based on the Meta Pixel. *See Simon v. Scripps Networks, LLC*, No. 24-CV-8175 (PKC), 2025 WL 3167915 (S.D.N.Y. Nov. 13, 2025).

"May 2024 JAMS Filing"). (Compl. ¶ 4.) On May 9, 2024, Discovery wrote to JAMS asking that it reject the demands because Keller Postman filed them in the wrong arbitral forum (i.e., JAMS rather than NAM). (Compl. Ex. H, ECF No. 8-11, PDF pp. 2-4.) On May 15, 2024, Keller Postman responded, arguing that "[b]y identifying that arbitration agreement and attaching it to the arbitration demand, Claimants have each met the filing requirements necessary to initiate arbitration against Discovery." (*Id.* at PDF pp. 6-8.)

In those communications, Keller Postman never (i) stated that it was invoiced for, or paid, a $250 filing fee for the each of the 693 arbitrations or (ii) contended that payment of such filing fee was required for JAMS to administer the arbitration. Nor does the Complaint allege or offer any evidence that the claimants in the May 2024 JAMS Filing (which included some of these Plaintiffs) paid any fees in connection with that fling.

On May 29, 2024, JAMS advised the parties that it was declining to proceed with any administration of the arbitrations:

> In light of the current Visitor Agreement, which names another arbitration provider and which appears to have gone into effect before these Demands were filed, JAMS is unable to proceed with administration at this time. If the parties agreed to JAMS, or if a court orders the parties to proceed at JAMS, we will be happy to proceed.

(Compl. Ex. H, ECF No. 1-8, at 10.) JAMS appears to have declined to administer the arbitration before invoicing any fees for the May 2024 JAMS Filing. Accordingly, the Complaint's conclusory allegation that Plaintiffs must "make all required payments" including the $250 "filing" to "commence arbitration at JAMS" (Compl. ¶¶ 34-36) is not supported by the record.

### 4.    In An Effort To Force Arbitration Before JAMS, Keller Postman Files the *Pilon* Action on Behalf of Two Petitioners

On June 21, 2024, Keller Postman filed a petition to compel arbitration before JAMS under Section 4 of the FAA on behalf of two petitioners: (i) Brian Pilon, who had continuously subscribed to discovery+ from August 2021 through June 2024, and (ii) Russell Stephen, who

stopped subscribing to discovery+ before February 1, 2023. *See Pilon v. Discovery Commc'ns, LLC*, No. 1:24-cv-04760-JPO (S.D.N.Y. filed June 21, 2024), ECF No. 1; *Pilon v. Discovery Commc'ns, LLC* 769 F. Supp. 3d 273, 282 (S.D.N.Y. 2025). The *Pilon* petition alleged that Discovery refused to arbitrate before JAMS. Discovery cross-moved to compel arbitration with Mr. Pilon before NAM pursuant to the NAM Agreement, and sought limited discovery from Mr. Stephen to determine if he might otherwise be bound by the NAM Agreement (for example, if he had re-subscribed after February 2023 with a different email address, or if a member of his household had subscribed after February 2023). *See Pilon*, 769 F. Supp. 3d at 281.

On March 10, 2025, Judge Oetken issued a decision that (i) granted Discovery's cross-motion to compel arbitration before NAM as to Mr. Pilon and (ii) granted Mr. Stephen's motion to compel arbitration before JAMS. *See Pilon*, 769 F. Supp. 3d at 289-91. Specifically, Judge Oetken found that Mr. Pilon was bound by the NAM Agreement because he received notice of that agreement and continued to subscribe to discovery+ thereafter. *Id*. at 289. Mr. Stephen was not bound by the NAM Agreement because he did not continue to subscribe to discovery+ after the NAM Agreement came into effect and he was not otherwise bound by that agreement. Almost nine months have passed since Judge Oetken issued the *Pilon* order, and to date, Keller Postman has not pursued either Mr. Pilon's or Mr. Stephen's putative claim in arbitration.

## 5. Keller Postman Demands That Discovery Tell Keller Postman Which of Its Putative Clients Are Bound by the JAMS Agreement So That Keller Postman Could Make a Mass Filing With JAMS

On April 14, 2025, Keller Postman emailed Discovery's counsel attaching a "list of 6,293 individuals" who were putatively "entitled to arbitrations at JAMS pursuant" to the JAMS Agreement, claiming that, under *Pilon*, "absent a countervailing showing of agreement to different terms, your client must arbitrate at JAMS." (Compl. Ex. I, ECF No. 8-12, at PDF p. 4.) Keller Postman asked Discovery to identify the individuals that "must instead arbitrate at NAM." (*Id*.)

On May 7, 2025, Discovery's counsel responded to Keller Postman:

> As we have previously informed your firm, the individuals whom you purport to represent include persons who (i) are dead, (ii) have never been subscribers of Discovery's properties, (iii) never interacted with Discovery's properties in the manner now alleged, (iv) have pursued claims under the wrong arbitration agreement; and/or (v) have claims that are time-barred. . . . You now request that Discovery devote its own resources to conduct the very investigation Keller Postman was obligated to conduct before asserting any claims in any forum. Your firm, in the course of communicating with each of your purported clients, should have investigated their interactions (if any) with Discovery's properties.

(*Id.* at PDF p. 5.) Discovery's counsel noted that Mr. Stephen—who was one of the *Pilon* petitioners—was on Keller Postman's list of 6,293 individuals and that Discovery was prepared "to arbitrate [Mr. Stephen's] dispute in JAMS" as the *Pilon* order provided. (*Id.* at PDF p. 6.)

Discovery's further communications with Keller Postman made clear that that firm had made no effort to determine which of those individuals had continued to subscribe to discovery+ after February 2023, and intended to rely on evidence assembled during its initial claimant intake process, largely in 2022, indicating that claimants had claimed to have used the discovery+ platform at some point in time. (*E.g.*, *id.* at PDF pp. 7-8.)

**D.    Keller Postman Files This Action, Seeking to Force Discovery to Perform Keller Postman's Client Representation Obligations for Them**

On August 4, 2025, Keller Postman filed the Complaint on behalf of 4,225 Plaintiffs under the DJA asking for "a declaration that each Plaintiff is entitled to arbitrate disputes with Discovery at JAMS or, alternatively a declaration specifying which forum, JAMS or NAM, each Plaintiff must file a demand in to arbitrate disputes with Discovery." (Compl., ECF No. 1, at 58 ("Request for Relief").) Relying on the May 2024 JAMS Filing, the Complaint alleges that "Plaintiffs would each pay a non-refundable $250 filing fee to initiate arbitration at JAMS." (*Id*. ¶ 41.) The Complaint attaches several thousand pages of exhibits, including (i) "Account Screenshots" (Compl. Ex. C, ECF No. 1-3) which purport to show that each Plaintiff had a discovery+

subscription and (ii) "Declarations" (Compl. Ex. D, ECF No. 4-1 *et seq.*), attesting that Plaintiffs "had an account with discovery+." (Compl. ¶ 14.) With few exceptions, the Declarations and Screenshots are all dated *before* the NAM Agreement came into effect on February 1, 2023. The Complaint and its Exhibits do not show the dates of each Plaintiff's subscription to discovery+.

The Complaint also did not disclose that at least one Plaintiff died between 2022 (when Keller Postman recruited her as a claimant) and the filing of this Action. (McTigue Decl. Ex. 7 (Powers Obituary).)[6] It is unlikely that Plaintiff authorized Keller Postman's filing of this action on her behalf. Indeed, there is no evidence that any of these Plaintiffs, living or dead, authorized the filing of this action on their behalf or are even aware that such an action has been filed.

### E.    Keller Postman Acknowledges at the Pre-Motion Conference That They Did Not Contact Their Clients to Gather Additional Information Before Bringing This Action

At the November 12, 2025 pre-motion conference in this action, this Court asked Keller Postman, "[w]hy haven't you asked [your clients] whether or not, pursuant to *Pilon*, they can bring their claims before JAMS?" (McTigue Decl. Ex. 1, Conf. Tr. at 11:23-12:1.) In response, Keller Postman confirmed that "we haven't asked the individual plaintiffs in this case whether their subscriptions persisted beyond February 2023." (*Id.* at 13:15-17.)

### LEGAL STANDARD

***Dismissal for Lack of Subject Matter Jurisdiction (Article III Standing).*** Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is required "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* "In resolving a motion to dismiss for lack of

---

[6]    Another Plaintiff died between the filing of the Complaint and the pre-motion conference on this Motion. (McTigue Decl. Ex. 8 (Singh Obituary).)

subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Id.* Thus, a defendant is permitted to offer evidence beyond a complaint, and in "opposition to such a motion, the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." *De Medicis v. Ally Bank*, No. 21 Civ. 6799 (NSR), 2024 WL 1257022, at *3 (S.D.N.Y. Mar. 25, 2024) (citations omitted).

   ***Dismissal for Failure to Plead a Legally Sufficient Claim.*** To survive a Rule 12(b)(6) dismissal motion, a plaintiff must allege enough facts to "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

## ARGUMENT

I.    **SUBJECT MATTER JURISDICTION IS LACKING HERE:**
      **PLAINTIFFS DO NOT HAVE ARTICLE III STANDING**
      **BECAUSE THEIR ASSERTED HARMS ARE COUNTERFACTUAL,**
      **SPECULATIVE, AND NOT REDRESSABLE BY THE REQUESTED RELIEF**

   Jurisdiction under the Declaratory Judgment Act "requires 'a case of actual controversy'; in other words, the plaintiff must have Article III standing." *Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, No. 22 Civ. 1860 (KPF), 2023 WL 4562031, at *19 (S.D.N.Y. July 14, 2023) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007)). Accordingly, the predicate "for declaratory relief is that a plaintiff [must] show '[i] that he suffered an injury in fact that is concrete, particularized, and actual or imminent; [ii] that the injury was likely caused by the

defendant; and [iii] that the injury would likely be redressed by judicial relief.'" *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). A "touchstone to guide the probe for sufficient immediacy and reality [of an injury] is whether the declaratory relief sought relates to a dispute where the alleged liability has already accrued or the threatened risk occurred, or rather whether the feared legal consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass." *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406-07 (S.D.N.Y. 2002) ("*Dow Jones I*"), *aff'd*, 346 F.3d 357 (2d Cir. 2003) ("*Dow Jones II*"). Thus, "a dispute giving rise to a request for declaratory relief 'must not be nebulous or contingent[,] but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.'" *In re SKAT Tax Refund Scheme Litig.*, Nos. 18-md-2865 (LAK), 18-CV-5053 (LAK), 2020 WL 400718, at *7 (S.D.N.Y. Jan. 23, 2020) (citations omitted).

Here, the Complaint alleges that absent the requested declaration, Plaintiffs will be harmed by having to pay nonrefundable JAMS filing fees. That "harm" to Plaintiffs is (i) nonexistent because Keller Postman has promised to pay such fees on Plaintiffs' behalf, (ii) purely speculative because it is not certain that JAMS would assess and refuse to refund such fees, and (iii) not redressable by the Complaint's requested declaration, because Discovery would still be able to challenge JAMS's jurisdiction before an arbitrator even if this Court held that Discovery were obliged to arbitrate before JAMS. Plaintiffs thus lack Article III standing and this Court does not have subject matter jurisdiction over their putative claims, as further explained below:

*First*, as a factual matter, even before Plaintiffs "signed up" for their claims against Discovery, Keller Postman promised each Plaintiff that "you owe nothing unless we get you compensation." (McTigue Decl. Ex. 3, at PDF p. 2.) Accordingly, any speculative "harm" in

having to pay JAMS filing fees will be borne by Keller Postman, not Plaintiffs. Plaintiffs do not have standing to seek redress for a purported harm to Keller Postman.[7]

To the extent Plaintiffs contend that any potential recovery from these actions will be reduced by the amount paid in JAMS fees, that too is insufficient to establish an Article III injury. It is well established that a plaintiff's "claims for any attorney's fees and costs he has incurred in bringing [a] claim do not establish an injury sufficient for standing purposes." *Epstein v. JPMorgan Chase & Co.*, No. 13 Civ. 4744 KPF, 2014 WL 1133567, at *7 n.6 (S.D.N.Y. Mar. 21, 2014); *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008) ("On the face of the complaint, [the plaintiff's] only interest in this litigation as an attorney-in-fact is the recovery of its legal fees, which are a byproduct of the suit itself and cannot serve as a basis for Article III standing." (internal quotation marks omitted).)

***Second***, Plaintiffs' purported harm is wholly contingent upon a speculative chain of possible actions that third parties may or may not take. Plaintiffs' purported harm depends on (i) Keller Postman's making a mass filing on Plaintiffs' behalf; (ii) JAMS' issuance of an invoice in connection with such a filing—a step that which JAMS does not appear to have taken when Keller Postman previously filed demands on behalf of these Plaintiffs; (iii) Keller Postman's payment of such an invoice; (iii) JAMS's refusal to administer the arbitrations; and (v) JAMS's subsequent refusal to refund any filing fees. That speculative chain of possibilities is far too hypothetical and uncertain to establish standing. The Supreme Court, the Second Circuit and courts

---

[7]    In the appellate context, where parties seeking to appeal are required to show that they were "aggrieved by the district court's order," numerous courts have held that a party does not have standing to appeal a sanctions order against their counsel that the party will not have to pay. *See, e.g.*, *Est. of Bishop v. Bechtel Power Corp.*, 905 F.2d 1272, 1276 (9th Cir. 1990); *Flanagan v. Benicia Unified Sch. Dist.*, 404 F. App'x 187, 188 (9th Cir. 2010); *Marshak v. Tonetti*, 813 F.2d 13, 21 (1st Cir. 1987) (same); *Bartels v. Sports Arena Emps. Loc. 137*, 838 F.2d 101, 104 (3d Cir. 1988) (same). Here, too, Plaintiffs do not have standing to redress a potential harm to their counsel.

in this District all routinely reject theories of standing that rest on a "speculative chain of possibilities" premised on assumptions about the conduct of non-parties.[8]

**Third**, Plaintiffs lack standing because they cannot show that the purported harm that they assert will be redressed by the relief they request. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-43 (1976) (standing lacking where it was "speculative whether the desired exercise of the court's remedial powers" would redress the plaintiffs' injuries). Even if this Court were to grant Plaintiffs' request for relief and JAMS then accepted a filing of arbitration demands from those Plaintiffs, Discovery could still challenge JAMS's jurisdiction before the arbitrator. JAMS Streamlined Rules, Rule 8(b) provides that "[t]he Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." Once in arbitration, and after each Plaintiff (or their counsel) has allegedly paid their nonrefundable filing fee, a JAMS arbitrator can still hold that a Plaintiff is bound by the NAM Agreement and dismiss that Plaintiff's arbitration for lack of jurisdiction. If so, that Plaintiff (or their counsel) may not recover any filing fee notwithstanding this Court's grant of declaratory relief. *See VariBlend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, No. 18 Civ. 10758 (ER), 2019 WL 4805771, at *15 (S.D.N.Y. Sept. 30, 2019) (Ramos, J.) ("[R]egardless of how the question of [which agreement binds plaintiffs] is resolved for purpose[s] of Declaratory Judgment, [each plaintiff] could still be liable for the

---

[8]    *E.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013) (citing cases; finding no standing where claims were premised on a series of assumptions about whether the government would engage in a particular form of surveillance); *Port Wash. Teachers' Ass'n v. Bd. of Educ. of Port Wash. Union Free Sch. Dist.*, 478 F.3d 494, 499-500 (2d Cir. 2007) ("conclusory statements" that plaintiffs would risk civil liability or professional discipline were insufficient because "the theoretical possibility that either might occur in the future does not amount to injury in fact"); *Dow Jones I*, 237 F. Supp. 2d at 408 (dismissing declaratory judgment claim for lack of standing where the complaint was "grounded on a string of apprehensions and conjectures about future possibilities" including possibilities based on the actions of third parties); *In re SKAT*, 2020 WL 400718, at *7 ("The injury [plaintiff] wishes to avoid is contingent upon foreign courts, primarily in actions not yet filed, issuing judgments that conflict with judgments that this Court may or may not issue. This is far too speculative to warrant declaratory relief.").

[nonrefundable filing fee] asserted in the complaint. Therefore, it is speculative at best that this economic injury will in any way be 'redressed by a favorable decision' on the declaratory judgment counterclaim." (citation omitted)).

*Fourth*, any "procedural delay" Plaintiffs will putatively suffer if they bring VPPA claims to JAMS but must later refile them in NAM would be due entirely to Keller Postman's strategy of pushing for arbitration in JAMS instead of gathering information from their clients that might show they are obliged to arbitrate before NAM. That delay would not be attributable to Discovery and thus cannot form the basis of Article III standing. *See Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 517-18 (7th Cir. 2010) (alleged "procedural" injury was not traceable to defendant where it was "entirely self-inflicted, resulting solely from [plaintiff's]" litigation strategy) (collecting cases); *Buckley v. Bassett*, No. 22-cv-01436 (JMA) (ARL), 2024 WL 896880, at *14 (E.D.N.Y. Mar. 1, 2024) ("[Plaintiff's] claim fails because any delay in [personal care services] authorization was not traceable to Defendants, but to the independent action of a non-party to this action."). In addition, at least two Plaintiffs lack Article III standing because they are dead and can no longer bring claims in their own name before any arbitration provider. (McTigue Decl. Exs. 7, 8.)

Accordingly, the Complaint should be dismissed for lack of subject matter jurisdiction.

## II.    PLAINTIFFS HAVE NOT PLED A LEGALLY SUFFICIENT CLAIM FOR RELIEF BECAUSE THERE IS NO LEGAL PREDICATE FOR THEIR REQUESTED DECLARATORY RELIEF

The DJA permits a district court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Although the DJA grants courts discretion to declare rights or other legal relations of an interested party, "that discretion does not extend to the declaration of rights that do not exist under law." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012). The DJA is "procedural only" and "does not create an

independent cause of action." *Id*. at 244-45 (citation omitted). Accordingly, "declaratory judgment relies on a valid legal predicate." *Id*. at 244. "A necessary prerequisite to the exercise of judicial power, then, is the presence before a court of a claim of substantive right." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 730-31 (2d Cir. 1993) (company seeking declaration that adversaries bringing asbestos claims must settle with company on a class basis had no entitlement to relief under DJA; "Courts do not have authority to compel parties to settle their cases . . . and [movant] does not assert that it has a right to a settlement"); *Harris Tr. & Sav. Bank v. E-II Holdings, Inc.*, 926 F.2d 636, 641 (7th Cir. 1991) (denying request for declaratory relief seeking to require defendant to provide information because "the Trustees have not put forth a cognizable legal basis under which they might be entitled to the information that they seek"); *see also In re SKAT*, 2020 WL 400718, at *7 (plaintiff seeking declaration that decisions in the United States are binding on defendant in foreign courts did not allege a "a valid legal predicate" for the claim).

Here, Plaintiffs' have asserted that the "FAA § 4 provides a legal right" for their requested relief. (ECF No. 26 at 3.) Section 4 of the FAA provides "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement." 9 U.S.C. § 4. But Discovery has not refused to arbitrate under any written agreement.

Plaintiffs do not and cannot allege that Discovery has taken the position that Plaintiffs' claims are not arbitrable. *See Barchha v. TapImmune Inc.*, No. 12 Civ. 8530 (PKC), 2013 WL 120639, at *3 (S.D.N.Y. Jan. 7, 2013) ("There is no assertion that the defendants have refused to arbitrate or that the plaintiff has attempted to commence an arbitration. . . . Indeed, defendants expressly acknowledge that plaintiff's claims are subject to arbitration."). Even assuming the hypothetical events posited by the Complaint were to transpire, if Discovery lodged an objection before JAMS to JAMS's jurisdiction, that would not constitute refusal to arbitrate: "The fact that

respondent[] raised before [JAMS] an objection to petitioner[s'] Demand[s] for Arbitration—and the fact that [JAMS] agreed with that objection—does not constitute a 'refusal to arbitrate' on the part of respondent[]." *Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004); *see also Frazier v. X Corp.*, 155 F.4th 87, 91 (2d Cir. 2025) (defendant's "refusal to pay the fees—and JAMS's discretionary decision to halt the arbitrations as a result—does not amount to a 'failure, neglect, or refusal . . . to arbitrate' by [defendant] that the district court was empowered to remedy under 9 U.S.C. § 4").

Nor do Plaintiffs allege that Discovery was, or will be "ordered to arbitrate" their disputes with JAMS and "fail[ed] to do so": accordingly, Plaintiffs cannot allege that Discovery is "in default of any arbitration agreement it may have with [plaintiffs]." *Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 725 F.2d 192, 195 (2d Cir. 1984). In short, Plaintiffs have no legal predicate for their requested relief, and the Complaint should accordingly also be dismissed on the independent basis that it fails to plead a legally sufficient claim.[9]

## III.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DISMISS THE COMPLAINT BECAUSE THIS ACTION WAS BROUGHT FOR IMPROPER PURPOSES

Even if this Court determines that Plaintiffs have standing or a legal predicate for their requested relief, the Court should nevertheless exercise its discretion to decline to exercise jurisdiction over this Action because, among other things, this Action is being used as an improper tactic to advance Keller Postman's mass arbitration threat. "The Declaratory Judgment Act by its express terms vests a district court with discretion to determine whether it will exert jurisdiction

---

[9]    The JAMS Agreement also does not provide Plaintiffs with a legal predicate for their requested declaration. As Plaintiffs emphasize, the JAMS Agreement "contains an express delegation clause requiring a JAMS arbitrator to decide arbitrability." (Compl. ¶ 33.) Should JAMS again determine that it does not have jurisdiction to arbitrate disputes brought by Plaintiffs again, that determination "is a procedural issue entrusted to the arbitrator or arbitral body—not the court—for resolution within that proceeding." *Frazier*, 155 F.4th at 91.

over a proposed declaratory action or not." *Dow Jones II*, 346 F.3d at 359. In exercising that discretion, courts often consider such factors as:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty[;] . . . [3] whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata"; [4] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [5] whether there is a better or more effective remedy.

*Id*. at 359-60 (citations omitted). In particular, courts have long cautioned against allowing a declaratory judgment action to be used as "device as a procedural weapon to gain a tactical advantage in the litigation." *Collins & Aikman Corp. v. Rabin*, No. 86 Civ. 1223 (WCC), 1986 WL 6162, at *5 (S.D.N.Y. May 27, 1986); *Unique Indus., Inc. v. Lisa Frank, Inc.*, No. 93 CIV. 8037 (LAP), 1994 WL 525041, at *3 (S.D.N.Y. Sept. 23, 1994) ("[C]ourts should not allow the declaratory judgment action to be employed as a tool for gamesmanship and manipulation.").

Here, dismissal of this action on discretionary grounds is warranted for numerous reasons:

**No "Useful Purpose."** Granting the requested relief would not "clarify or settle any relevant legal issues" or "finally resolve the controversy" of which Agreement applies between Plaintiffs and Discovery. *In re SKAT*, 2020 WL 400718, at *8. Even if JAMS were to accept a mass filing by Plaintiffs, Discovery could challenge JAMS's jurisdiction before an arbitrator, and if that objection were successful, Plaintiffs would not be refunded their filing fee. (*See* Part I *supra*.) Thus, granting the relief would not "serve a useful purpose in clarifying the legal relations between the parties." *Dow Jones I*, 237 F. Supp. 2d at 439.

**This Action Is Mere "Procedural Fencing."** This Action is a transparent attempt by Keller Postman to compel Discovery to provide information that Keller Postman could obtain by contacting its own purported clients, so that Keller Postman may more economically file demands

*en masse* with JAMS—all in the hopes of coercing a settlement from Discovery and avoiding the threat of sanctions for bringing an improper action Keller Postman would otherwise face under the NAM Agreement. That is gamesmanship, pure and simple, and it does not warrant burdening this Court with this action. *See Dow Jones I*, 237 F. Supp. 2d at 440 (denying request for declaratory relief where plaintiff's "litigation in this Court amounts to strategic forum-shopping motivated by pursuit of a tactical edge over an opponent").

Keller Postman has claimed that "Discovery's issue is not with the procedures it mandated and Plaintiffs followed, but with the fact that the claims exist at all." (ECF No. 26 at 3.) This is misdirection: Discovery has been willing to arbitrate Plaintiffs' dispute before NAM pursuant to the agreement to which Plaintiffs agreed. It is Keller Postman that has no desire to arbitrate claims on the merits in any forum—as evinced by Keller Postman's failure to arbitrate either of the *Pilon* petitioners' claims in the months since the *Pilon* decision was issued—because Keller Postman's strategy depends on the fees associated with *mass* filings. The Ninth Circuit has sharply criticized Keller Postman's gamesmanship in other VPPA mass arbitration efforts, remarking that Keller Postman's judicial requests "cast[] serious doubt[s] over the true motivation underlying the mass-arbitration tactic deployed here, which appears to be geared more toward racking up procedural costs to the point of forcing [the streaming service] to capitulate to a settlement than proving the allegations of [the VPPA claims] to seek appropriate redress on the merits." *Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1183 (9th Cir. 2025).

Worse yet, Keller Postman continues to pursue Plaintiffs' VPPA claims even though the Second Circuit has now expressly "shut the door for Pixel-based VPPA claims." *Hughes*, 2025 WL 1720295, at *2; *accord Solomon*, 136 F.4th at 52, 54-55. Keller Postman has never seriously disputed that the claims have no merit, but instead argues that the claims are "more than viable in

*arbitration*," (ECF No. 26 (emphasis added)), suggesting that an arbitrator would just ignore those precedents. Further, Keller Postman knows that if it prosecutes Plaintiffs' VPPA claims before NAM, it would likely face sanctions, because under the NAM Agreement (unlike the JAMS Agreement), "[t]he arbitrator is authorized to impose any sanctions under the NAM Rules, Federal Rule of Civil Procedure 11, or applicable federal or state law, against all appropriate represented parties *and counsel*." (NAM Agreement, Compl. Ex. G, ECF No. 8-10 (emphasis added).)[10]

***There Is a "More Effective Remedy."*** The Complaint's demand that Discovery generate information for Keller Postman's benefit is not the most effective remedy for Plaintiffs' putative harm. The most effective remedy lies with Keller Postman and Plaintiffs themselves: they should assess whether their use of the discovery+ platform binds them to the JAMS or NAM Agreement. The Complaint does not allege that Keller Postman or Plaintiffs have undertaken any efforts to assess that question. If Plaintiffs have forgotten their subscription dates, they can readily look them up: even former subscribers can access their accounts to obtain this information. *See Pilon*, 769 F. Supp. 3d at 282 ("Users are able to log into the Discovery+ service even after their subscriptions have ended . . . ."). But Keller Postman, having expended its resources to gather thousands of clients, does not want to expend further resources to contact those clients.

Even in this action, Keller Postman has been careful to minimize its own efforts. The several-thousand-page compendiums of exhibits (Compl. Exs. C-E, ECF Nos. 1-3, 1-4, 1-5) and cross-reference chart (*id*. Ex. A, ECF No. 1-1) omit any information about Plaintiffs' dates of

---

[10]     The threat of sanctions for bringing an improper mass arbitration is substantial, as evidenced by the *Roku, Inc. v. Womble* action, where a California court enforced an arbitrator's order requiring a claimants' firm to pay a fee award due to the firm's representation of an arbitration claimant who, in conjunction with "a large number of related cases," filed an arbitration that "was frivolous and brought for an improper purpose." Joint Stipulation and Order on the Confirmation of Arbitration Award; Judgment, *Roku, Inc. v. Womble*, No. 25-cv-458510 (Cal. Super. Ct. Santa Clara Cnty. June 24, 2025); Petition to Confirm Arbitration Award, Attachment, *Roku, Inc. v. Womble*, No. 25-cv-458510 (Cal. Super. Ct. Santa Clara Cnty. Feb. 7, 2025).

subscription, apparently hoping that the Court will take counsel's word that those submissions show "that each Plaintiff is entitled to arbitrate disputes with Discovery at JAMS." (Compl. Request for Relief.) A review of these exhibits shows that is not true for all Plaintiffs: for example, Keller Postman's own submission shows that Plaintiff Remy Turner would be bound by the NAM Agreement. (*See* McTigue Decl. Ex. 9 (screenshot showing that Turner's "Next Payment" for discovery+ is "on 3/18/2023," demonstrating that he was subscribed after February 1, 2023).)

Plaintiffs may respond that even if Keller Postman were to obtain updated evidence and submit it to JAMS, Discovery could still object to a mass filing before JAMS and that JAMS might decline to administer the arbitrations. But the May 2024 JAMS Filing merely submitted an arbitration demand and a copy of the JAMS Agreement. "Nothing in the [Complaint] permits an inference" regarding what action JAMS will take if faced with a filing with updated evidence of Plaintiffs' subscription history: "this problem is conjectural." *In re SKAT*, 2020 WL 400718, at *8.

Accordingly, this Court should exercise its discretion to deny Plaintiffs' relief.

## IV.    THE COURT SHOULD NOT GRANT PLAINTIFFS LEAVE TO AMEND

Plaintiffs have had months since the *Pilon* decision was issued to muster a factual basis for the allegations in the Complaint. Plaintiffs had a further opportunity to amend in response to Discovery's pre-motion letter detailing the shortcomings of the Complaint. But Plaintiffs did not do so, nor did they suggest at the pre-motion conference that they could cure any of the Complaint's deficiencies by amending. Amendment would be futile and dismissal with prejudice is therefore appropriate. *See Healthcare Fin. Grp., Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 350 (S.D.N.Y. 2009) (dismissing claim with prejudice and without leave to amend where plaintiff already had ample opportunity to amend).

V.    **IN THE ALTERNATIVE, THE COURT SHOULD SEVER AND DISMISS
PLAINTIFFS' CLAIMS BECAUSE THEY ARE IMPROPERLY JOINED**

Federal Rule of Civil Procedure 21 provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. In assessing joinder and severance issues, courts consider "factors, including (1) whether severance will serve judicial economy; (2) whether prejudice to the parties would be caused by severance; and (3) whether the claims involve different witnesses and evidence." *Nolan v. Int'l Bus. Machs. Corp.*, No. 24-CV-04653 (PMH), 2025 WL 1078392, at \*1 (S.D.N.Y. Apr. 10, 2025) (citation omitted). "Plaintiffs bear the burden of demonstrating that joinder is proper." *McQuoid v. Nationstar Mortg., LLC*, No. 13-cv-2338 (DRH), 2015 WL 13774445, at \*1 (E.D.N.Y. Apr. 2, 2015). If a court holds that claims have been improperly joined, it can "sever[]" and "dismiss[]" the improperly joined claims without prejudice. *Id.* at \*3. Here, severance and dismissal are both warranted:

***First***, as noted above, both the JAMS and NAM Agreements prohibit bringing actions on a consolidated basis. (Compl. Ex. F, ECF No. 8-9, at PDF p. 21; Compl. Ex. G, ECF No. 8-10, at PDF p. 23.) Courts applying New York law routinely enforce such prohibitions by granting motions to strike class allegations based on a class action waiver. *See, e.g.*, *Hahn v. JetBlue Airways Corp.*, No. 21-CV-6867 (CBA) (LB), 2022 WL 22908406, at \*7 (E.D.N.Y. Aug. 25, 2022) (dismissing class allegations based on a class action waiver); *U1it4Less, Inc. v. FedEx Corp.*, No. 11-cv-1713 (KBF), 2015 WL 3916247, at \*6 (S.D.N.Y. June 25, 2015) (same). Enforcement of that provision is likewise warranted here.

***Second***, joinder of all these claims is improper because the inquiries that will be required to assess which agreement binds each of the 4,225 individual Plaintiffs would be impractical for this Court to oversee in one action. Discovery's records would not finally resolve this dispute because there is information not within Discovery's possession and only in Plaintiffs' possession

that will be relevant to assessing which arbitration agreement applies. A Plaintiff who ceased subscribing before February 2023 would still be bound by the NAM Agreement if that Plaintiff re-subscribed later (perhaps using different contact information) or if Plaintiff became the authorized user of a discovery+ account maintained by another member of that Plaintiff's household. (Compl. Ex. G, ECF No. 8-10 at PDF pp. 16-17.) Determining which agreement binds each Plaintiff may therefore require "examination of many different transactions or occurrences." *Corley v. Google, Inc.*, 316 F.R.D. 277, 285 (N.D. Cal. 2016) (severing action brought by 879 plaintiffs which individualized inquiry to determine which privacy policy each plaintiff agreed to). Courts have severed cases involving thousands of improperly joined plaintiffs where the complaint merely attached "spreadsheets listing the names of just under four thousand other individuals who were not referenced anywhere in the body of the Complaint," and where "[defendant] would want the opportunity to conduct discovery as to each individual Plaintiff" and such discovery "would take many years." *Jones v. Ford Motor Co.*, No. 24-10721, 2024 WL 4719702, at *1, *9 (E.D. Mich. Nov. 8, 2024). As the *Ford* court observed, "counsel for Plaintiffs want their clients to have the benefits of litigating individual claims against Ford, but without the standard obligations and burdens associated with doing so, such as paying a filing fee to initiate a civil action, filing a complaint that includes the factual allegations supporting their claims, being deposed during discovery." *Id*. at *10. They are not entitled to do that. Accordingly, severance is warranted.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendant's Motion should be granted.

Dated:   New York, New York
         December 3, 2025

Respectfully submitted,

*/s/ Michael W. McTigue Jr.*
Michael W. McTigue Jr.
(michael.mctigue@skadden.com)
Meredith C. Slawe
(meredith.slawe@skadden.com)
Kurt Wm. Hemr
(kurt.hemr@skadden.com)
Andrew D. Quinn
(andrew.quinn@skadden.com)
SKADDEN ARPS SLATE
    MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001-8602
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Defendant*
*Discovery Communications, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Michael W. McTigue Jr., an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) and Rule 2.B.i of Judge Edgardo Ramos's Individual Practices, that the foregoing Memorandum of Law was prepared using Microsoft Word, contains 8712 words in accordance with Local Rule 7.1(c), and does not exceed 25 pages as required by Rule 2.B.i of Judge Ramos's Individual Practices.

Dated: New York, New York          /s/ *Michael W. McTigue Jr.*
       December 3, 2025                    Michael W. McTigue Jr.

27